21-8091 United States v. Lara Yes, we're ready when you are. Good morning, Your Honors. Arturo Hernandez on behalf of Appellant Mr. Lara. He's in custody at Terminal Island serving a 70-month sentence. Basically this case is way different than the one that we just heard earlier. There was no dog jumping up and down and giving probable cause. The dog did not alert here. That's great news for my client. Basically this started out with a hunch by VA agent McDermott. And it's basically an interdiction program that scares me because it resembles Gestapo tactics. All they have to do is go to a motel and see a different license plate from out of state, from a traveler, could be a very lawful citizen, and he just gets to the place without a reservation. And that's enough for them to start a federal investigation by the Drug Enforcement Agency. In this case... Did they have more information than that? That's all they had. Did they have information about the car rental situation at that point? At that point, they had no information whatsoever. They go inside to the clerk and they ask, how did he pay? He paid either cash or credit card, but he didn't have a reservation. Bingo. That's enough to start an investigation. At that point, VA... Go ahead. He ran the plates then though, and then he contacted the rental car company and learned of a prior rental in March. That is correct. There was some information about rentals. And then he got the phone number that he left with the hotel, and he learned that that phone number had been associated with a prior drug deal. There was information about that telephone number, not necessarily my client's phone number, because cell numbers change all the time. Well, it's the phone number that he gave to the hotel, and they connected that phone number with drug trafficking. That is correct. That was the information that they had. But I don't think that was enough insufficient to have probable cause to follow my client up to the point where he is stopped. Well, you don't have to have probable cause to follow someone, do you? Well, no. They had probable cause to believe he exceeded the speed limit. Correct. And so they pulled him over for a traffic violation. That is correct, Your Honor. What happened is that... And so you would concede that the traffic stop was adequately supported. Well, it was supported by the testimony in court under oath. I personally find it very suspicious that an officer from the Wyoming Highway Patrol, Kerling, is told by the D-Agent to stop this vehicle. Albeit, he, in quote, you find your own probable cause. So he stations himself, and I went myself and investigated where the stop was. And it's a downhill situation where the speed limit changes rapidly to 65. And that, I suspect, is only for truck drivers who are coming down. It reminds me of the grapevine in L.A. where they have a speed trap for truck drivers that are going too fast, and there's dangers. Officer Kerling is told to stop, to make the stop. He does. At that point, he has no other job to do except to give him a traffic ticket. He tells him immediately upon opening the passenger side window that he is going to give him a traffic warning. That's it. And he sees two cell phones, right? I don't think he sees anything at that point. What he does is that he tells him to go to his car. He says he approached the passenger side window and observed two cell phones in the vehicle. Well, if that's what he testified in court, I don't think that's the point. The point is that how long does it take to give somebody a traffic ticket? Well, I guess in some ways we have the same issue we had in the prior case, is that even though you're moving forward with a traffic violation, you can also be observing things that support a reasonable suspicion of another crime. And so each piece that they're learning, the question is, was it enough for them to have reasonable suspicion to continue the inquiry? I understand, Your Honor, but this case reeks of something that was meant to happen and they were going to make it happen. They were going to pull him over. And we've had, I mean, there have been challenges to the pretext stop. And the Supreme Court has said that that's okay, that they can be suspicious of something else and that's okay, that they can be suspicious of something else, whether it's your suspended license or speeding or drifting out of your lane, when the real goal might be to ask questions, explore something else. But so long as you really did commit that traffic offense, it's okay if that's a pretext for something else. I think it was a pretext stop. We can't prove it. I think the court below found that the traffic stop was legal. But the point here is that they obtained numerous points of They had a dog sniff. They called the dog handler. I assume they went two or three times around the truck. That hunch didn't come through. They should have let it go. There was no reason to follow up on any other investigation. As I understand the facts, after the dog didn't alert, he was given a warning and the trooper Kerlin then asked Mr. Lara, after he gave him the written warning, if he could ask him some more questions. And Mr. Lara agreed. Yeah, but he also said, he also answered the question, I don't want my car searched. Well, that was after they had a conversation. So he had in his mind, he was letting the officer know that he didn't want to conduct any more conversation. He wanted to leave. Well, but he continued to converse. Can I ask you some more questions? And he said, yes, just don't search my car. Well, if you're in the officer's car and he had him in the back seat or in the front seat of his car, it's for a young man to be intimidated in that situation. It's logical that he's going to try to answer politely and he's going to be as amenable to all the questions. But he's telling him, I don't want to answer any more of your questions. That means I want to leave. So that to me, the part of the conversation that ensued that involved the description of rentals and the time frame of where he came from, where he's going, bringing the car back to Oklahoma City, driving back to California. All of these travel plans, in the trooper's view, seemed quite unreasonable and very suspicious. Well, the questions are reasonable. The answers are also reasonable. I don't want to answer. I want to go home. I want you to let me go. He answered the questions. Well, he described his travel plans in detail. But he also said, I don't want to answer questions. I want to either, you'd let me talk to your supervisor or you let me go. And he asked, can I leave? He said, well, you can leave, but we're going to keep the truck. And you're out there in the middle of nowhere. So they got an affidavit, I mean a warrant, to search the truck. And you've challenged that, saying that the information in the affidavit was tainted by the improper questioning of the officer. But I'm not sure what paragraphs of the affidavit you would excise from the affidavit, because most of what's in the affidavit didn't come from the discussions. I think in my pleadings, I indicated that there were approximately 17 or 18 factors they were using, and at least eight were done before the issuance of the ticket. Well, but they were also things that, there's a lot of the information in this warrant that was information that they learned that unrelated to the traffic stop. Well, but the information that was obtained was illegally obtained, as the Supreme Court cases indicate. It was a fishing expedition, and they just kept going and going, and they got most of the information for the warrant that shouldn't have been used, because it was illegally obtained. This is clearly a violation of the Fruit of the Poisonous Tree Doctrine. If we, when we're analyzing this, we are supposed to excise from the affidavit anything that was improperly obtained, and then assess whether the affidavit can still support the search without those paragraphs. And so I'm trying more specifically to have you identify for me, if you can, which paragraphs you think should, that shouldn't be considered. I don't have the warrant with me, and I apologize, Your Honor. Okay. I would submit it on my pleadings. Okay. Unless the court has further questions, I would reserve my five minutes for rebuttal. Thank you. Good morning. My name is Eric Hyman, and I represent the United States of America. Your Honor, the district court's denial of the suppression motion in this case should be affirmed, because there was no violation of the Fourth Amendment. Special Agent McDermott identified a car, learned of its rental agreement, that it was rented out of Oklahoma City the day before, pulled into Cheyenne, and was going westbound when it needed to be returned in Oklahoma City two days later on Friday, March 6th. He asked a trooper to pull the car over if the trooper had an independent basis for doing so, which is exactly what happened. The defendant below in the district court and in this appeal does not challenge the factual finding that his client was speeding, and that was probable cause for the stop. He also makes no argument regarding reasonable suspicion. So in the first instance, this court should affirm, because he's waived any challenge to the district court's reasonable suspicion findings and conclusions, if, Your Honors, choose to address the reasonable suspicion finding by the district court, you should affirm it. The court found that the first 10 minutes of the stop were entirely justified by the probable cause for speeding. Mr. Lauer agreed to answer questions while sitting in the trooper's front seat of the car, and he was asked questions about his travel plans, which this court has repeatedly said are justified. Those travel plans were bizarre and implausible. He had a rental agreement, verified, the trooper knew it because he was shown it, that he had gotten the car in Oklahoma City on the 3rd, was going west, supposedly to Idaho, and had to be back in Oklahoma City on Friday, the 6th, but intended to be home in California by the weekend, but he's afraid of flying, drove one way, rental, Oklahoma City originally, didn't know that Idaho was a state, and didn't know where he was going in Idaho without looking at his phone. The trooper didn't believe him that he was going to Idaho, and this court generally defers to a law enforcement officer's judgment about credibility, and should do so here. So these implausible, bizarre, almost impossible travel plans begin to establish reasonable suspicion. The defendant was also evasive when the trooper asked him during these first 10 minutes, how'd you get from California to Oklahoma City while you rented a car one way? Why? I have a lot of family everywhere. He evaded that question. Evasions, this court has said, can establish reasonable suspicion. The two cell phones, they were seen when the trooper walked up to the passenger side at the beginning of the stop. And the trooper explained that in his experience, 11 years, doing interdictions, and through all his training during that time, multiple cell phones are an indicator of drug trafficking activity. The court also had testimony from Special Agent McDermott, that I-80 is a drug trafficking corridor, and California is a source state. We have case law though, I mean, the entire I-80 is a drug trafficking corridor, I mean, it can't weigh very heavily. It doesn't, but it doesn't have to, because of all the other things that are there. It's not an onerous standard, and I say it also because the travel plans in this case are not just implausible. They are 100% consistent with drug trafficking. A drug trafficker who's taking controlled substances from California to the interior of the country doesn't want to keep that car. So the one-way rental is entirely consistent with a drug courier, because they want to get away from that car. They don't want to be driving around in that car, which may have a residual odor of the drugs. The quick trip, the very short turnaround on these trips, is consistent with a drug run, whether taking money back west or controlled substances to another state in the interior of the country. The court found that the traffic stop was prolonged after about 10 minutes. It's after the dog had run and not alerted when Trooper Curlin got out of the car to check with Deputy Houston, and he said, I'm going to ask for consent. And the court properly found that that was the end of the traffic stop. Trooper Curlin got back in and gave the defendant his warning, his documents, asked him to answer some more questions, which Mr. Lurie agreed to do. But he didn't really learn anything new at that point. And because he had prolonged the traffic stop, it's at about that 10-minute mark where he gets out that we have to judge reasonable suspicion. But the court properly found that he had it to continue the detention. After that, the court found that the trooper reasonably pursued that investigation. He contacted a county attorney to try to figure out if he had probable cause for a search warrant. He got more information from Special Agent McDermott, and he got more information from Enterprise. That's when he learned there had been three prior three-day rentals out of Oklahoma City. Those records are independent of the detention. But he learned it during that time. Your Honor asked about the search warrant. In the defendant's brief, he claims that paragraphs 3i through 3p, all of them, are entirely tainted by the allegedly prolonged detention. The only we go through in our brief, those various paragraphs, and almost everything there was either learned independently by Special Agent McDermott or Trooper Kerlin from Enterprise or from DEA records, or was learned during that first 10 minutes that the district court properly found was part of the traffic stop. The only paragraphs that really go away are 3m, as in Mary, and part of 3n. M and what was the other one? N as in Nancy, Your Honor. There is a part of 3n, Nancy, where Trooper Kerlin, I believe, talks about his experience regarding cell phones. And that... Well, he sees, he finds the third cell phone. That's the paragraph. The third cell phone should be excised because if, if, if the detention is bad. Right, right, right. If it were, the third cell phone would have to be excised. But his statement that multiple cell phones are an indicator would not have to be. That's his. That's independent. The only other part that's really in those paragraphs that I think is at all relevant to probable cause is the defendant staring into the back of the truck while he's getting his luggage as if he wanted to get something out of it. He says he doesn't want his car searched. I don't think that's relevant either way to probable cause. So really, the detention was good because there was reasonable suspicion at the time that the traffic stop was prolonged at about 10 minutes. And regardless, the search warrant provided probable cause to search that car because the information in it was either gathered independent of that detention at the side of the road or was gathered during the traffic stop. The lawful part, the undoubtedly lawful part, the first 10 minutes. If your honors have any questions, I'm happy to answer them. Otherwise, we'll stand in our brief. Thank you. Give us a second to get the clock. Give us one second to get the clock set up. It's not showing on our side. Yeah, it's not showing here. There it is. Thank you. But that's not right. Yeah, there we go. Again, your honor, the issue here, as far as we're concerned, is the illegality of the detention, in this case, the prolonged investigation period of time that they were looking for information and used to get the warrant. The officer testified he could do it in seven minutes. And that's standard. He went way beyond the amount of time or the reason. I thought you were not disputing the first 10 minutes as being permissible. He testified that he could do it in seven minutes. Right, he did. But are you contesting any period or any problem with the first 10 minutes of this stop? Well, it would have been, I think it's a lot more than that because he didn't even have to get the client, my client, out of his car and put him in his car. All he had to do is give him the ticket while he's in his vehicle. The standard procedure. He went beyond what he was allowed to do legally and took way, way more time. Again, do you have any problem with the first 10 minutes of the stop? I believe, yes. You do, okay. Yes. And that's what I'm trying to explain. There's no clock like we have here. We can assume that if he's going to call someone to come and get the K-9 to inspect the vehicle, which turns out to be something in our favor, nothing there. How long does that take? When he, when he makes, gets out of the car and calls officer, the, the agent, McBurn. It's another period of time that it happens. So I think that the period of time that he detained my client illegally and obtained information thereafter, it's, it's grounds for us to have that motion granted. And this case should be dismissed. So basically that's our argument and I submit it. Thank you. We'll take this matter under advisement.